BARBARA FALLER, APPELLEE, v. BAPTISTE FALLER,
APPELLANT.

Evidence. In the case made, *Held*, that the evidence is not suffi-
cient to sustain a decree of divorce on either cause of action
stated in the petition.

APPEAL from Richardson county. Tried below be-
fore WEAVER, J.

*Schoenheit & Thomas*, for appellant.

*S. Price and C. Gillespie*, for appellee.

COBB, J.

This is an action for divorce. The petition sets out
that the plaintiff was married to the defendant nearly
twenty-six years ago. "That soon after said mar-
riage the defendant commenced treating her and did
treat her with extreme cruelty and inhumanity; that
on various occasions he has struck and kicked her in
anger and with great violence, thereby endangering
her life. That he has refused to supply her with the

Faller v. Faller.

necessaries of life, and still refuses to supply her with them, when it was and is in his power to supply her with them.

These general charges bring the case, as is claimed, within sec. 7 of chap. 19 of the general statutes. The petition also contains statements of particular instances of ill treatment tending to sustain the general charges. The charges are denied in the answer, both in general and in detail. Had a demurrer been interposed to the second cause of action it must have been sustained, for the facts therein set out are neither within the letter or spirit of the statute. It is not enough that the husband, being of sufficient ability, shall refuse to supply her with the necessaries of life, but this refusal or neglect must be done grossly or wantonly and cruelly, as said by the court in the case cited by appellant: " These words were used for the purpose of giving to the conduct of the husband in this respect the character which they imply, and are not to be disregarded."

But as the court below found for the plaintiff generally, such finding will be sustained if the proof is sufficient to sustain the cause of action, which is properly set out in the petition. But upon a careful examination of the testimony contained in the bill of exceptions, and putting the most favorable construction upon it, I am forced to the conclusion that it is altogether insufficient to establish either charge. It would be trifling with law as well as language to say that any of the evidence of slight difficulties between the plaintiff and defendant set forth in the evidence, even taking the testimony of the plaintiff alone, amount to either cruel or inhuman treatment on his part. I do not forget that great deference is due to findings of the court who tries a cause, before whom witnesses personally appear, and who thus has an op-

portunity to judge of their intelligence and candor; yet, in cases of appeal, this court cannot avoid the responsibility of examining the testimony for itself, and, with due consideration of the conclusions of the trial court, put such construction upon it as the case seems to call for.

Upon the trial the plaintiff, being sworn, in her own behalf testified as follows:

Q.  State what acts of cruelty Mr. Faller has been guilty of?  Give the places and dates.

A.  He treated me in such a way; for instance, he and his son pushed me out of the house—out of the old house I had my property.  I had flour in the house where they pushed me out.  The old man, Baptiste Faller, and the wife of the son, pushed me out of the house.  I went to one of the back rooms of the old house, where I had my things, flour and provisions. In the mean time they moved the little house, which was a smoke-house, into the field for my purpose; when I went back to get some flour to bake bread the young woman had taken the flour away.  I was in the act of getting the scoop out of the flour when, in doing so, the young wife met me and called me a sow; the young wife always stating that I should go out of the house, and thereafter the defendant and son pushed me out of the house.  Only the defendant— the old man—pushed me out of the house.  And after, the old man and the young wife told me I had no more business in the yard and about there, that my place was up in the little house in the field.  They never furnished me with any victuals in the little smoke-house.  In many instances I asked them to furnish me with victuals while in the smoke-house, but they refused.

Q.  What did the defendant say to you when he drove you away?

A. I don't remember; I did not pay any attention to it. He took me by the arm and said: "Get out of here; you have no more business here; your place is in the house on the hill. You have got your own things in the little house and shall stay there." When the old man pushed me out of the house the young woman stood near another door and talked through the door, keeping it partly open, and called me sow, sow, sow, several times. I then picked up a few corn-cobs and threw them at her, but she shut the door, and I threw, and she opened it again and called me sow, sow, sow.

Q. Did your husband throw a dish at you?

A. About three years ago he threw a dish at me.

Q. When did these matters take place?

A. About the middle of May last.

Q. Did he furnish you any necessaries while you were there out in the smoke-house?

A. Since the time I left the house and went into the smoke-house they have not furnished me with anything. From the time they moved me they have not furnished any victuals. When I was in the act of getting water from below the young woman was calling me names, such as witch and whore, and threw sticks and stones at me, saying if I attempted again to come in the yard she would kill me.

Q. Was defendant there at this time?

A. No, he was not.

Q. How long did you live in that smoke-house in that situation—you say it was about the thirtieth of April, 1879, when he put you in the smoke-house—how long did you live in the smoke-house before they moved it out in the orchard?

A. Two months and a half.

Q. How long did you live in the smoke-house before it was moved?

A.   I lived with defendant in the smoke-house for about three years.

Q.   What did defendant say to you was the reason for putting you out in the field?

A.   As soon as Ferd. married he was only three days with me yet in the smoke-house; that he lived with me in the smoke-house; after that he took his things—his knives and forks—to the young folks, and let me alone in the smoke-house.

Q.   How long did you live there until they moved it out into the field?

A.   About two weeks—half a month.

Q.   What other cruelty was he guilty of besides that—what did he do and say to you?

A.   During this time he had no conversation with me; he had nothing to say, only what the young folks told me.

Q.   What provisions did he give you, and what did he do for you?

A.   He has not furnished me with anything, only that which I had left in the smoke-house.

Q.   What other abuse was he guilty of towards you—what else did he do to you?

A.   He has been three times in the smoke-house, fetching away some stovepipe, whereat I told him he should furnish me something to live on.

Q.   What did he say?

A.   He did not answer anything besides demanding some feathers, a few days afterwards, at the same time intimating if I did not give the feathers he would take the bed away—at which time I asked him again to furnish me with something to eat.

Q.   What did he say, in reply?

A.   He answered nothing.   A few days afterwards he fetched a butter-stamper away.   He pushed the door in with a fence rail.   At another time I was in

the act of getting water—the young woman and his sister again threatened me with a board, and calling me bad names; and the old man was in the yard.

Q. Did the old man hear it?

A. He was present. After I had the water and left the gate, the young woman and her sister threw a piece of board at me.

Q. Did he chide these people at all—did he say anything to them?

A. He only took the sister of the young woman away, and he told her to go away.

Q. Did this defendant ever strike you or hit you with his fist?

A. Not at that time; but the winter previous, during the winter, he several times threatened me, with his fist before my face; and during the fall, once, at midnight, he had me on the floor.

Q. How far was the smoke-house in the field from the well?

A. About from here to Good's Hotel (about a block).

Q. Did defendant offer to live with you there in the smoke-house, and take care of you as his wife?

A. No, no!

The testimony of other witnesses shows quite clearly that the arrangement by which the plaintiff continued to occupy the small house called "the smoke-house," by herself, was a voluntary one on her part; that she first suggested the removal of said small building up into the field; that she pointed out to the house-movers employed by defendant to move the house—the exact spot where it was put. That said house was sufficiently furnished, and that she was sufficiently supplied with provisions. It is quite evident that the whole trouble arose from quarrels between the plaintiff and the young wife of her step-son, Ferdinand

Faller; and the belief on her part that the defendant did not side with her at all times, and with sufficient energy.

As, in my opinion, the testimony fails to prove either cause of action stated in the petition, the decree of the district court must be reversed.

REVERSED AND REMANDED.